UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| UNICORN GLOBAL, INC., | § | |
| HANGZHOU CHIC INTELLIGENT | § | |
| TECHNOLOGY CO., LTD., AND | § | |
| SHENZHEN UNI-SUN ELECTRONIC | § | |
| CO., LTD., | § | Civil Action No. 3:19-cv -00754 |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Jury Trial Demanded |
| | § | |
| GOLABS, INC. d/b/a GOTRAX, LLC, | § | |
| WALMART INC., WAL-MART STORES | § | |
| TEXAS, LLC, AND WAL-MART.COM | § | |
| USA LLC, | § | |
| | § | |
| Defendants. | | |

---

## PLAINTIFFS' OPENING CLAIM CONSTRUCTION BRIEF

---

Michael C. Wilson
Texas Bar No. 21704590
mwilson@munckwilson.com
S. Wallace Dunwoody
Texas Bar No. 24040838
wdunwoody@munckwilson.com
Kelly P. Chen
kchen@munckwilson.com
Texas Bar No. 24062664
**MUNCK WILSON MANDALA, LLP**
12770 Coit Road, Suite 600
Dallas, Texas 75251
(972) 628-3600 – phone
(972) 628-3616 – fax

**ATTORNEYS FOR PLAINTIFFS**

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................ 2

ARGUMENTS AND AUTHORITIES .......................................................................... 8

    A.    Claim Construction Standard............................................................................ 8

    B.    Agreed Terms ................................................................................................. 10

    C.    Disputed Terms ............................................................................................. 11

        1.    "disposed symmetrically"............................................................................ 11

        2.    "inner cover" ............................................................................................. 17

        3.    "rotating mechanism" .............................................................................. 23

        4.    "bearing" ................................................................................................... 26

        5.    "limiting shaft" ......................................................................................... 28

        6.    "an inner cover fixed between the top cover and bottom cover" ........................ 30

CONCLUSION ............................................................................................................ 30

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Accuhale, LLC v. AstraZeneca, LP*,
No. 6:11-CV-707, 2013 WL 4045904 (E.D. Tex. Aug. 7, 2013)........................................25

*Albritton v. Acclarent, Inc.*,
No. 3:16-CV-03340-M, 2019 WL 1379984 (N.D. Tex. Jan. 16, 2019)........................24, 29

*Apex Inc. v. Raritan Computer, Inc.*,
325 F.3d 1364 (Fed. Cir. 2003) ........................................................................................25

*Apple Inc. v. Samsung Elecs. Co.*,
786 F.3d 983 (Fed. Cir. 2015) ..........................................................................................16

*Aventis Pharm. Inc. v. Amino Chemicals Ltd.*,
715 F.3d 1363 (Fed. Cir. 2013) ..........................................................................................9

*Cryovac Inc. v. Pechiney Plastic Packaging, Inc.*,
CIV.A. 04-1278-KAJ, 2006 WL 956599 (D. Del. Apr. 13, 2006)....................................13

*Electro Med. Sys. S.A. v. Cooper Life Sciences*,
34 F.3d 1048 (Fed. Cir. 1994) ..........................................................................................20

*Halliburton Energy Services, Inc. v. M-I LLC*,
514 F.3d 1244 (Fed. Cir. 2008) ........................................................................................10

*Integrity Worldwide, LLC v. Rapid-EPS LTD.*,
No. 3:17-CV-0055-K, 2018 WL 3609430 (N.D. Tex. May 29, 2018) ...............................25

*Karsten Mfg. Corp. v. Cleveland Golf Co.*,
242 F.3d 1376 (Fed. Cir. 2001) ........................................................................................16

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
358 F.3d 898 (Fed. Cir. 2004) ..........................................................................................25

*Markman v. Westview Instruments, Inc.*,
517 U.S. 370 (1996)............................................................................................................8

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
572 U.S. 898 (2014)..........................................................................................................10

*One-E-Way, Inc. v. Int'l Trade Comm'n,*
   859 F.3d 1059 (Fed. Cir. 2017) ........................................................16

*Phillips v. AWH Corp.,*
   415 F.3d 1303 (Fed. Cir. 2005) .....................................................9, 25

*Ruckus Wireless, Inc. v. Innovative Wireless Sols., LLC,*
   824 F.3d 999 (Fed. Cir. 2016) ..........................................................16

*Sonix Tech. Co., Ltd. v. Publications Int'l, Ltd.,*
   844 F.3d 1370 (Fed. Cir. 2017) ........................................................16

*TEK Glob., S.R.L. v. Sealant Sys. Int'l, Inc.,*
   920 F.3d 777 (Fed. Cir. 2019) .....................................................10, 24

*Turrill v. Mich. S. & N. Ind. R.R.,*
   68 U.S. 491 (1863).............................................................................15

*U.S. Surgical Corp. v. Ethicon, Inc.,*
   103 F.3d 1554 (Fed. Cir. 1997) ..........................................................8

*Whittaker Corp. v. UNR Indus., Inc.,*
   911 F.2d 709 (Fed.Cir.1990) ............................................................16

*Williamson v. Citrix Online, LLC,*
   792 F.3d 1339 (Fed. Cir. 2015) ........................................................10

*Zeroclick, LLC v. Apple Inc.,*
   891 F.3d 1003 (Fed. Cir. 2018) .....................................................9, 29

**Statutes**

35 U.S.C. § 112 ......................................................................... *passim*

# INTRODUCTION

There are six disputed terms presented for construction. As summarized below, Defendants' proposed constructions violate bedrock claim construction principles by, for example, (1) ignoring the plain and ordinary meaning of the claim language in light of the specification, (2) importing limitations from the specification into the claims, or (3) needlessly changing the wording of a claim to render it indefinite. To summarize the disputes:

"***disposed symmetrically***" – Defendants seek to set up an indefiniteness argument by changing the ordinary meaning of the claim language from a verb (disposed) and adverb (symmetrically) into an adjective meaning "basically the same," which Defendants contend is ambiguous and indefinite;

"***inner cover***" – Defendants ignore the plain meaning of the claim language requiring a top cover, a bottom cover, and an inner cover fixed between the top and bottom cover, and argue that any internal framework—even molding that is part of the top or bottom cover—is an "inner cover," a position that departs from the ordinary meaning of the word "cover," ignores the examiner's reason for allowance, and tries to read the claims on prior art they were allowed over;

"***rotating mechanism***" – To make a non-infringement argument, Defendants argue that the term "rotating mechanism" is a means-plus-function limitation, despite the absence of "means for" language in the claims, despite the absence of any intrinsic evidence that the examiner or patentee intended the term to be governed by § 112(f), and despite the presence of dependent claims that are rendered superfluous by Defendants' proposed construction;

"***bearing***" – To support their "rotating mechanism" non-infringement theory, Defendants argue that the term "bearing" should be construed narrowly to mean only one particular type of bearing—a rotary bearing—to the exclusion of all other types of mechanical bearings, such as sliding bearings, axial bearings, or thrust bearings, but there is no reason to add such a limitation to the term "bearing";

"***limiting shaft***" – In support of an indefiniteness argument, Defendants contend that the term "limiting shaft" is a means-plus-function limitation, even though the claims do not use "means for," the term "shaft" is itself structural, the claims recite surrounding structural elements, and there is no intrinsic evidence that the examiner or patentee intended the term to be governed by § 112(f);

"***an inner cover fixed between the top cover and the bottom cover***" – To narrow the claims, Defendants propose interpreting "fixed between" to mean "fixed inside," and adding in the words "so that it is not exposed," but there is no reason to change the claim language or to add additional limitations to the claims.

For these disputed claim terms, the Court should reject Defendants' proposed constructions and adopt plain and ordinary meaning constructions that are consistent with the specification.

## BACKGROUND

Plaintiffs Unicorn Global, Inc. ("Unicorn"), Hangzhou Chic Intelligent Technology Co., Ltd. ("Chic"), and Shenzhen Uni-Sun Electronic Co., Ltd. ("Uni-Sun") (collectively, "Plaintiffs") filed this patent infringement action against Defendant Golabs, Inc. d/b/a GoTrax ("Golabs") on March 26, 2019. [D.I. 1]. The Walmart defendants were added in an amended complaint filed on May 9, 2019 (collectively, "Defendants"). [D.I. 12].

Plaintiffs served infringement contentions on June 14, 2019, asserting three patents—two utility patents and one design patent—all relating to two-wheel electric balance vehicles commonly called "hoverboards." The parties have not identified any claim construction issues regarding the design patent,[1] so the discussion below focuses on the two utility patents: US 9,376,155 ("the '155 patent") (App. 5) and US 9,452,802 ("the

---

[1] The asserted design patent is US D737,723 (the "D723 patent").

'802 patent") (App. 20).[2] The '802 patent is a continuation of the '155 patent, and both patents share the same specification and figures. For the sake of simplicity, the discussion below refers to figures and passages from the '155 patent, but the same specification support also appears in the '802 patent.

The asserted claims are claims 1-5, 7, 8, 11-13, and 16 of the '155 patent and claims 1-3, 5, 6, 9-11, and 14 of the '802 patent (collectively, the "asserted claims"). The parties filed a joint claim construction statement ("JCCPS") on September 27, 2019, [D.I. 99], identifying the following disputed claim terms and phrases:

| # | Claim Term / Phrase |
|---|---------------------|
| 1 | "disposed symmetrically" |
| 2 | "inner cover" |
| 3 | "rotating mechanism" |
| 4 | "bearing" |
| 5 | "limiting shaft" |
| 6 | "an inner cover fixed between the top cover and bottom cover" |

The disputed terms appear in the exemplary claims from the '155 patent quoted below, which are representative for claim construction purposes:

1. An electric balance vehicle, comprising:

a top cover comprising a first top cover and a second top cover ***disposed symmetrically*** and rotatable relative to each other;

a bottom cover fixed to the top cover, the bottom cover comprising a first bottom cover and a second bottom cover disposed symmetrically and rotatable relative to each other;

---

[2] Both asserted utility patents claim priority to Chinese patent application no. CN201410262353, filed June 13, 2014, and to PCT application no. PCT/CN2014/092849, filed December 2, 2014.

*an <u>inner cover</u> fixed between the top cover and the bottom cover*, the inner cover comprising a first inner cover and a second inner cover disposed symmetrically and rotatable relative to each other;

a *rotating mechanism* fixed between the first inner cover and the second inner cover;

two wheels rotatably fixed at two sides of the inner cover, respectively;

two hub motors fixed in the two wheels, respectively;

a plurality of sensors disposed between the bottom cover and the inner cover;

a power supply fixed between the first bottom cover and the first inner cover; and

a controller fixed between the second bottom cover and the second inner cover, wherein the controller is electrically connected with the plurality of sensors, the power supply, and the hub motors, and the controller controls the hub motors to drive the corresponding wheels to rotate according to sensing signals transmitted by the sensors. (App. 17).

5. The electric balance vehicle according to claim 1, wherein the rotating mechanism comprises two *bearings*, a shaft sleeve, and two snap springs, the two bearings are fixed to the first inner cover and the second inner cover respectively, and the shaft sleeve is fixed inside the two bearings and is fixed to the inner cover via the two snap springs. (App. 17).

13. The electric balance vehicle according to claim 1, further comprising a *limiting shaft* disposed between the first inner cover and the second inner cover, wherein the length of the limiting shaft in the second inner cover is larger than the length of the limiting shaft in the first inner cover. (App. 17-18).

Figure 2 is an exploded diagram of an exemplary electric balance vehicle 100 that "includes a top cover 1, an inner cover 2, a bottom cover 3, two hub motors 4, two wheels 50, a rotating mechanism 60, a plurality of sensors 80, a power supply 81, and a controller 82" ('155 patent at 3:49-53 (App. 8, 14)):

4



FIG. 2

"The top cover 1 includes a first top cover 11 and a second top cover 12, and the first top cover 11 and the second top cover 12 are disposed symmetrically and rotatable relative to each other." ('155 patent at 3:54-57 (App. 14)). "The shapes of the first top cover 11 and the second top cover 12 are basically the same, and the first top cover 11 and the second top cover 12 can rotate relative to each other under the action of the rotating mechanism 60." ('155 patent at 3:65-41 (App. 14)).

"The bottom cover 3 includes a first bottom cover 31 and a second bottom cover 32, and the first bottom cover 31 and the second bottom cover 32 are disposed symmetrically and rotatable relative to each other. The shapes of the first bottom cover 31 and the second bottom cover 32 are basically the same, and the first bottom cover 31

5

and the second bottom cover 32 can rotate relative to each other under the action of the rotating mechanism 60." ('155 patent at 4:46-53 (App. 14)).

"The inner cover 2 is fixed between the top cover 1 and the bottom cover 3. The inner cover 2 includes a first inner cover 21 and a second inner cover 22, and the first inner cover 21 and the second inner cover 22 are disposed symmetrically and rotatable relative to each other. The shapes of the first inner cover 21 and the second inner cover 22 are basically the same, and the first inner cover 21 and the second inner cover 22 can rotate relative to each other under the action of the rotating mechanism 60." ('155 patent at 5:13-21 (App. 15)).

"The rotating mechanism 60 may be installed in the middle of the inner cover 2, and the longitudinally installed hub motors 4 are fixed to the left and right edges." ('155 patent at 5:21-23 (App. 15)). The specification describes a "first embodiment" of a rotating mechanism with two bearings, a shaft sleeve, and two snap springs, but it does not define the term "rotating mechanism" or state that the "rotating mechanism" is limited to that particular embodiment:

> The rotating mechanism 60 is fixed between the first inner cover 21 and the second inner cover 22. In the first embodiment, the rotating mechanism 60 includes two bearings 61, a shaft sleeve 62, and two snap springs 63. The two bearings 61 are fixed to the inner ends of the first inner cover 21 and the second inner cover 22, respectively. The shaft sleeve 62 is fixed inside the two bearings 61 and is fixed to the inner cover 2 via the two snap springs 63. Thus, the left and right inner covers of the inner cover 2 can rotate under the cooperation of the rotating mechanism 60. Due to the arrangement of the rotating mechanism 60, the two parts of the vehicle body of the electric balance vehicle 100 can rotate freely and relatively.

6

('155 patent at 6:12-24 (App. 15)). In fact, the specification describes alternative configurations in the specification ('155 patent at 5:25-37 (App. 15)), and claims various alternative configurations of the rotating mechanism in a related patent with the same specification. (*See* '036 patent at Abstract and 11:12-12:11 (App. 35, 48); *see also* Maslen Decl. at 9-10 [D.I. 90]).

"The two wheels 50 are rotatably fixed at two sides of the inner cover 2, respectively, and the two hub motors 4 are fixed in the two wheels 50, respectively. The hub motor 4 is also called in-wheel motor, wherein power, transmission, and braking devices are incorporated into a hub, so that a large quantity of transmission components can be omitted, the structure of the balance vehicle can be simpler, a better space utilization rate can be obtained, and the transmission efficiency can be improved at the same time. Since the hub motor 4 have the characteristic of independently driving a single wheel, differential steering similar to a crawler-type vehicle can be achieved by different rotating speeds and even by inversion of the left and right wheels 50, so that the turning radius of the vehicle can be greatly reduced, and in-situ steering can be nearly achieved under a particular condition." ('155 patent at 6:38-52 (App.15)).

"The plurality of sensors 80 are disposed between the bottom cover 3 and the inner cover 2. In detail, a half of the sensors 80 are disposed between the first bottom cover 31 and the first inner cover 21, and the other half of the sensors 80 are disposed between the second bottom cover 32 and the second inner cover 22. The power supply 81 is fixed between the first bottom cover 31 and the first inner cover 21. The controller 82 is fixed between the second bottom cover 32 and the second inner cover 22." ('155 patent at 6:53-

61 (App. 15)). "The controller 82 is electrically connected with the plurality of sensors 80, the power supply 81, and the hub motors 4, and the controller 82 controls the hub motors 4 to drive the corresponding wheels 50 to rotate according to sensing signals transmitted by the sensors 80." ('155 patent at 7:17-22 (App. 16)).

The invention is not intended to be limited to the particular embodiments described because the specification states, "[a]lthough the present invention has been described in considerable detail with reference to certain preferred embodiments thereof, the disclosure is not for limiting the scope of the invention. Persons having ordinary skill in the art may make various modifications and changes without departing from the scope and spirit of the invention. Therefore, the scope of the appended claims should not be limited to the description of the preferred embodiments described above." ('155 patent at 9:47-54 (App. 17)).

## ARGUMENTS AND AUTHORITIES

### A.    Claim Construction Standard

The interpretation of a patent's claims is a question of law to be decided by the court. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 391 (1996). "Claim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement. It is not an obligatory exercise in redundancy." *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997). The court need not "repeat or restate" every claim term. *Id.*

"It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005). In construing the terms of a patent, the court begins with the words of the claims themselves, and those words "are generally given their ordinary and customary meaning." *Id.* at 1312–13. The ordinary and customary meaning of a claim term "is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Id.* at 1313. "[T]he person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.* at 1313. Where "the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, . . . claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Id.* at 1314. "There is a heavy presumption that claim terms are to be given their ordinary and customary meaning." *Aventis Pharm. Inc. v. Amino Chemicals Ltd.*, 715 F.3d 1363, 1373 (Fed. Cir. 2013).

With respect to means-plus-function limitations under 35 U.S.C. § 112(f) (pre-AIA § 112(6)), "the mere fact that the disputed limitations incorporate functional language does not automatically convert the words into means for performing such functions." *Zeroclick, LLC v. Apple Inc.*, 891 F.3d 1003, 1008 (Fed. Cir. 2018). Rather, the court must first look to whether the limitation uses the word "means." If so, there is a rebuttable presumption that § 112(f) applies; if not, there is a rebuttable presumption that the

provision does not apply. *See Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1348 (Fed. Cir. 2015) ("[W]hen a claim term lacks the word 'means,' the presumption can be overcome and § 112, para. 6 will apply if the challenger demonstrates that the claim term fails to 'recite[ ] sufficiently definite structure' or else recites 'function without reciting sufficient structure for performing that function.'") (quoting *Watts v. XL Sys., Inc.*, 232 F.3d 877, 880 (Fed. Cir. 2000)). "Although connoting precise physical structure is not a necessary condition to avoid § 112, ¶ 6 application, it is generally sufficient." *TEK Glob., S.R.L. v. Sealant Sys. Int'l, Inc.*, 920 F.3d 777, 786 (Fed. Cir. 2019). Generally, § 112(f) does not govern where the surrounding claim language or dependent claims "add limitations that either describe particular structural features or flesh out whether the term has a particular structural meaning." *Id.*

With respect to alleged indefiniteness, a patent is invalid for indefiniteness only if "its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014). Because indefiniteness renders a claim invalid, it must be proved by clear and convincing evidence to overcome the presumption of validity. *See Halliburton Energy Services, Inc. v. M-I LLC*, 514 F.3d 1244, 1249 (Fed. Cir. 2008).

## B.    Agreed Terms

The parties have agreed and stipulated that all terms and phrases not identified as disputed should be given their plain and ordinary meaning. (Joint Claim Construction Prehearing Statement at Ex. A [D.I. 99-1]). Accordingly, the Court should adopt a plain

and ordinary meaning construction for any term or phrase not identified by the parties as "disputed" in Exhibit B to the JCCPS. (*Id.*) The parties also agree that the term "fixed" should be construed as "securely placed or fastened." (*Id.*) Below are examples of how "fixed" appears in the claims:

- "an inner cover ***fixed*** between the top cover and the bottom cover . . . "

- "a rotating mechanism ***fixed*** between the first inner cover and the second inner cover;"

- "two wheels rotatably ***fixed*** at two sides of the inner cover, respectively;"

- "two hub motors ***fixed*** in the two wheels, respectively;"

The agreed construction is consistent with how the term is used in the claims and in the specification ('155 patent at claims 1, 5, Fig. 2, 1:45-46, 2:4-9, 4:37-45, 5:21-23, 6:12-24, 6:38-40, 6:58-61), and also in everyday speech to mean "securely placed or fastened." (App. 68) (Merriam-Webster, "fixed"). Accordingly, the Court should adopt the parties' agreed construction of the term "fixed."

### C.  Disputed Terms

#### 1.  "disposed symmetrically"

| Plaintiffs' Proposal | Defendants' Proposal |
|---|---|
| arranged or positioned symmetrically<br><br>not indefinite | arranged such that there is correspondence in size, shape, and relative position of parts on opposite sides of a dividing line--or indefinite. |

The parties' dispute concerns whether the term "disposed symmetrically" refers to the arrangement or positioning of the two covers (as Plaintiffs contend), or refers to

the similarity of the two covers (as Defendants contend). The phrase appears in the independent claims of the '155 and '802 patents, as in the following examples:

- "a top cover comprising a first top cover and a second top cover ***disposed symmetrically*** and rotatable relative to each other;"

- "a bottom cover fixed to the top cover, the bottom cover comprising a first bottom cover and a second bottom cover ***disposed symmetrically*** and rotatable relative to each other;"

- "an inner cover fixed between the top cover and the bottom cover, the inner cover comprising a first inner cover and a second inner cover ***disposed symmetrically*** and rotatable relative to each other[.]"

Starting with the plain meaning of the claim language itself, the word "disposed" is a verb meaning "arranged" or "positioned." (App. 80-81) (Merriam-Webster "disposed").[3] And "symmetrically" is an adverb meaning "having, involving, or exhibiting symmetry." (App. 93) (Merriam-Webster "symmetrically"). Thus, the term "disposed symmetrically," by the plain meaning of the words used, "denotes the spatial relationship between these parts and not their relative forms." (*See* Maslen Decl. at 10 [D.I. 90]). The term "disposed symmetrically" does not mean that the two parts must be "substantially identical" to one another, or "basically the same," as Defendants contend. As examples, guests around a dinner table, or numbers on a clock, may be "disposed

---

[3] Both sides' experts agree that "disposed symmetrically" means "arranged or positioned symmetrically." *See* Maslen Decl. at 10 [D.I. 90]; 2019-08-23 Singhose Dep. at 82:23-83:12 ("Q. You did a claim construction for 'disposed symmetrically'; right? A. Yes, I did. Q. And you would agree with me that the term 'disposed' means arranged; right? A. That's certainly one meaning of 'disposed.' I mean, it has other meanings, but I think, viewing it in light of these specifications, I would say arranged or positioned, those are probably pretty good understandings of 'disposed.' Q. So if we look at the phrase 'disposed symmetrically,' you agree that that means that the covers have to be arranged or positioned symmetrically? A. Yes, I do.") (App. 238).

symmetrically," even though they (the guests or numbers) are not identical to one another or basically the same. (*See* Maslen Decl. at 10-12 [D.I. 90]). Likewise, although they are not identical to one another (they are mirror images) and have other differences (such as a wedding ring, unique fingerprints, and wrinkles), a POSITA would readily understand and see that they are arranged symmetrically.



Turning to the specification, multiple passages (quoted in the background section above) use the term "disposed symmetrically" when referring to the arrangement or positioning of the respective parts of the top cover 1, bottom cover 3, and inner cover 2 shown in Figures 2-3. (*See, e.g.,* '155 patent at 3:54-57, 3:65-41, 4:46-53, and 5:13-21 (App. 8-9, 14-15)). This is similar to how Judge Jordan in Delaware construed the term "arranged symmetrically" in *Cryovac Inc. v. Pechiney Plastic Packaging, Inc.*, CIV.A. 04-1278-KAJ, 2006 WL 956599, at *6 (D. Del. Apr. 13, 2006), where he concluded that "the term 'arranged symmetrically' requires only symmetrical arrangement of the layers in

the film, but not precise identity in the thickness or chemical composition of those layers. . . . The word 'symmetrically' modifies the word 'arranged,' and thus requires only that the layers should be symmetrical in their arrangement. Nothing about this language requires or even suggests that corresponding layers must be precisely identical in thickness or chemical composition, having geometric symmetry around a center line."

Defendants argue, alternatively, that the term "disposed symmetrically" is either indefinite or that it should be construed as "arranged such that there is correspondence in size, shape, and relative position of parts on opposite sides of a dividing line." Both arguments are based on the flawed notion that the inventors acted as their own lexicographer and defined the term "disposed symmetrically" to mean "basically the same." But that is not true. The specification states that the "*shapes*" of the first and second covers of the exemplary embodiment are "basically the same," ('155 patent at 3:65-66, 4:49-51, and 5:17-18) (App. 14-15)), but the specification does not *define* the term "disposed symmetrically." The term "disposed symmetrically" does not even appear in the sentences discussing the *shapes* of the covers; it appears in different sentences describing the *arrangement* of the parts. ('155 patent at 3:54-57, 4:46-49, and 5:14-17 (App. 14-15)). Moreover, the figures show that the first and second covers are not identical; for example, the right bottom cover includes a charging port and power button that are not on the left bottom cover.

14



Defendants' proposed construction improperly attempts to add the additional limitation that there must be "correspondence in size, shape, and relative position of parts on opposite sides of a dividing line." But that is not required by the claim language or the specification. And Defendants' expert goes further awry by declaring that the "shapes of the first and second covers – top, bottom and inner – [must be] fundamentally identical." (Ex. B to Joint Claim Construction Prehearing Statement at 2 [D.I. 99-1]; *see also* Singhose Decl. at ¶¶ 133-36 [D.I. 65]). Again, that is not required by the claim language or the specification. And Dr. Singhose's proposed construction substantially changes the meaning of "disposed symmetrically" from a verb and adverb describing the spatial relationship of the parts to an adjective requiring that the parts be identical—a change that is inconsistent with the plain meaning of the claim language and the specification, and must be wrong if it renders the claims invalid as he asserts. *See Turrill v. Mich. S. & N. Ind. R.R.*, 68 U.S. 491, 510 (1863) (emphasis added) ("Patents for inventions are . . . to receive a liberal construction, and . . . to be so interpreted as to uphold and not to destroy

the right of the inventor"); *Ruckus Wireless, Inc. v. Innovative Wireless Sols., LLC*, 824 F.3d 999, 1004 (Fed. Cir. 2016) ("If, after applying all other available tools of claim construction, a claim is ambiguous, it should be construed to preserve its validity."); *see also Karsten Mfg. Corp. v. Cleveland Golf Co.*, 242 F.3d 1376, 1384 (Fed. Cir. 2001) ("Claims amenable to more than one construction should, when it is reasonably possible to do so, be construed to preserve their validity."); *Whittaker Corp. v. UNR Indus., Inc.*, 911 F.2d 709, 712 (Fed. Cir. 1990) ("[C]laims are generally construed so as to sustain their validity, if possible.").

Dr. Singhose also argues that "disposed symmetrically" is indefinite because the specification states that the shapes of the respective covers are "basically the same" but fails to teach "the degree of unsymmetrical features[] that falls within the scope of the claims." (Singhose Decl. at ¶¶ 135, 259-269 [D.I. 65]). This argument also hinges on Defendants' flawed claim construction that improperly construes "disposed symmetrically" as referring to the similarity of the covers in terms of size and shape, instead of merely requiring that they be arranged or positioned symmetrically. (*See* Maslen Decl. at 41 [D.I. 90]).[4] "[U]sing a plain meaning that components are disposed

---

[4] Even if the claims required the shapes of the covers to be "basically the same," that should not render the claims indefinite because that term of degree is not purely subjective but rather it involves what can be seen by the normal human eye. *See Sonix Tech. Co., Ltd. v. Publications Int'l, Ltd.*, 844 F.3d 1370, 1378 (Fed. Cir. 2017) ("The question whether something is 'visually negligible' or whether it interferes with a user's perception, however, involves what can be seen by the normal human eye. This provides an objective baseline through which to interpret the claims."); *see also One-E-Way, Inc. v. Int'l Trade Comm'n*, 859 F.3d 1059, 1064–66 (Fed. Cir. 2017) (the term "virtually free from interference" was not indefinite); *Apple Inc. v. Samsung Elecs. Co.*, 786 F.3d 983, 1002 (Fed. Cir. 2015) (the term "substantially centered" was not indefinite).

(arranged/positioned) symmetrically (in a balanced/symmetrical manner), a POSITA reading the claims in light of the specifications and figures would have no trouble understanding the scope of the claims and determining whether the limitation is met." ([D.I. 90] at 41). Accordingly, the Court should reject Defendants' proposed construction and construe the term "disposed symmetrically" according to the plain and ordinary meaning of the words used.

### 2.    "inner cover"

| Plaintiffs' Proposal | Defendants' Proposal |
|---|---|
| plain and ordinary meaning<br><br>Alternatively, a cover that is not part of a top/bottom cover | internal framework that provides firmness to the entire structure of the vehicle, protection of internal electronic elements and support for fixing internal components |

The dispute regarding the term "disposed symmetrically" is whether to adopt the plain and ordinary meaning of the claim language as is, or abandon it in favor of Defendants' proposed construction that changes the term "cover" to "framework" and adds three functional limitations from the specification without any proper justification for doing so. The term "inner cover" appears repeatedly throughout the claims, as in the following examples from claim 1:

- "an *inner cover* fixed between the top cover and the bottom cover, the inner cover comprising a first *inner cover* and a *second inner* cover disposed symmetrically and rotatable relative to each other;"

- "a rotating mechanism fixed between the first *inner cover* and the second *inner cover*;"

- "two wheels rotatably fixed at two sides of the *inner cover*, respectively;"

- "a plurality of sensors disposed between the bottom cover and the *inner cover*[.]"

Starting with the claim language, the claims recite a top cover, a bottom cover, and an inner cover fixed between the top cover and the bottom cover. And the specification describes the inner cover as part of a three-layer structure: "the top cover 1, the inner cover 2, and the bottom cover 3 jointly form the framework of the electric balance vehicle 100, and after the top cover 1 and the bottom cover 3 are fixed together, the inner cover 2 is covered inside the vehicle body and is not exposed." ('155 patent at 4:39-44 (App. 14)). This is depicted in Figure 2, which shows "a first inner cover 21 and a second inner cover 22," marked in blue below, that are "disposed symmetrically and rotatable relative to each other" ('155 patent at 5:13-17 (App. 15)):



FIG. 2

"The rotating mechanism 60 is fixed between the first inner cover 21 and the second inner cover 22. . . . Thus, the left and right inner covers of the inner cover 2 can rotate under the cooperation of the rotating mechanism 60. Due to the arrangement of the rotating mechanism 60, the two parts of the vehicle body of the electric balance vehicle 100 can rotate freely and relatively." ('155 patent at 6:12-24 (App. 15)). "The two wheels 50 are rotatably fixed at two sides of the inner cover 2, respectively," ('155 patent at 6:38-39 (App. 15)), and the sensors 80, power supply 81, and controller 82 are all disposed between the inner cover 2 and the bottom cover 3. ('155 patent at 6:53-7:8 (App. 15)). The inner cover is preferably made of aluminum alloy, and the outer covers are preferably made of plastic. ('155 patent at 5:64-6:11 (App. 15)). Thus, the specification makes clear that (1) the inner cover is part of a multi-layer structure that includes a top cover, an inner cover, and a bottom cover, (2) the inner cover is not part of the top or bottom cover; (3) the inner cover includes a first part and a second part that are rotatable relative to one another via a rotating mechanism, (4) the inner cover has two wheels attached at the outer edges of the inner cover; and (5) the inner cover sits over (and covers) the controller, sensors, and battery.

Given that the plain meaning of the term "inner cover" is apparent when reading the claims in light of the specification and consistent with the ordinary meaning of the words used in the claim, it is unnecessary to redefine the term "inner cover," except to make clear that the inner cover is a separate structural element that is fixed between the top cover and the bottom cover, and not a part of the top cover or the bottom cover. Accordingly, Plaintiffs propose a plain and ordinary meaning construction for the term

"inner cover," or, alternatively, propose that the term "inner cover" be defined as "a cover that is not part of a top/bottom cover."

Defendants' proposed construction improperly attempts to import the following limitations from the specification into the claims:

> The inner cover 2 is used as the internal framework of the entire balance vehicle 100 to indirectly bear the weight of the user transferred by the pedals 5, thereby preventing electronic elements between the inner cover 2 and the bottom cover 3 from being extruded by the weight of the user. Therefore, the entire electric balance vehicle 100 is firmer and stronger, and the electronic elements therein are protected, such that the balance vehicle 100 operates more stably and has longer service life. Preferably, the inner cover 2 is made of aluminum alloy. Thus, the strength is higher, and the structure is more stable.

('155 patent at 5:55-65 (App. 15)). The specification goes on to distinguish the claimed invention with an inner cover from conventional electric balance vehicles without an inner cover, stating:

> The top cover 1 and the bottom cover 3 are made of plastic, so that the weight of the entire vehicle body is reduced, the processes, such as spray coating, coloring and so on, are conveniently carried out on the appearance of the vehicle body, and antifouling and waterproof functions are achieved. Since the conventional electric balance vehicle does not include the inner cover 2, the internal electronic elements
> directly bear the weight of the user, and due to the shaking generated during the driving process of the conventional balance vehicle, an automatic power off situation is easy to occur, and the user is easy to fall down during driving. The electric balance vehicle 100 in the present invention has solved this technical problem.

('155 patent at 5:66-6:11 (App. 15)). But it is improper to import such limitations into the claims. *See, e.g., Electro Med. Sys. S.A. v. Cooper Life Sciences*, 34 F.3d 1048, 1054 (Fed. Cir. 1994) ("particular embodiments appearing in a specification will not be read into the claims when the claim language is broader than such embodiments.").

20

One of the prior art patents cited during prosecution was U.S. patent no. 8,738,278 to Shane Chen ("the '278 Chen Patent"), which is listed on the face of the asserted patents as a cited reference. (*See* '155 patent at Abstract (App. 5); '802 patent at Abstract (App. 20)). The '278 Chen Patent discloses "[a] two-wheel, self-balancing personal vehicle having independently movable foot placement sections." ('278 Chen Patent at Abstract, Figs. 1-2 (App. 50-52)). But it does not teach or disclose a three-layer structure with an inner cover as claimed in the asserted patents; rather, it teaches that "[e]ach platform section 110, 130 may include a housing member 112, 132," which "may be formed of metal, sturdy plastic or other suitable material," and "may be molded and incorporate strengthening reinforcements, and be shaped to receive and 'nest' the internal components . . . of the vehicle." ('278 Chen Patent at 2:46-58 (App. 55)). Mr. Chen specifically admitted in a text conversation with Golabs that his design ***"didn't have the inner cover,"*** as claimed in the asserted patents. (Shane Chen Text Message (App. 261)).

The examiner allowed the asserted patents over the '278 Chen Patent and noted that "the prior art fails to disclose an inner cover fixed between a top cover and a bottom cover, the inner cover comprising a first inner cover and a second inner cover disposed symmetrically and rotatable relative to each other; a rotating mechanism fixed between the first inner cover and the second inner cover; and two wheels rotatably fixed at two sides of the inner cover, respectively." (Notice of Allowance (App. 64)). As pointed out by Plaintiffs' expert, there are multiple other elements relating to the "inner cover" limitations that differentiate the asserted patents from the '278 Chen Patent and its commercial embodiment, the Hovertrax product. ([D.I. 90] at 41-45).

Based on the plain and ordinary meaning of the claim language and the specification, a person of ordinary skill in the art would understand that (1) the inner cover is part of a multi-layer structure that includes a top cover, an inner cover, and a bottom cover, (2) the inner cover includes a first part and a second part that are rotatable relative to one another via a rotating mechanism, (3) the inner cover has two wheels attached at the outer edges of the inner cover; and (4) the inner cover sits over the controller, sensors, and battery. Given that the plain meaning of the term "inner cover" is apparent when reading the claims in light of the specification, there is no reason to construe or redefine the term "inner cover."

Defendant's proposed construction is wrong in at least three ways. First, it improperly changes the term "cover" to "framework," trying to eliminate one of the grounds the patentees used to distinguish the claimed invention from conventional electric balance vehicles. Second, it improperly attempts to import several functional limitations from the specification into the claims. Third, it substitutes 23 words for 2 without any compelling reason to do so. For at least these reasons, the Court should reject Defendants' proposed construction and adopt a plain and ordinary meaning construction for "inner cover."

### 3.   "rotating mechanism"

| Plaintiffs' Proposal | Defendants' Proposal |
|---|---|
| plain and ordinary meaning | Rotating mechanism fixed between the first inner cover and second inner cover. The rotating mechanism having two bearings, a shaft sleeve, and two snap springs, the two bearings fixed to the first inner cover and the second inner cover respectively, and the shaft sleeve fixed inside the two bearings and fixed to the inner cover via the two snap springs. |

The dispute over "rotating mechanism" is whether the term is a means-plus-function limitation under 35 U.S.C. § 112(f), despite the presumption against it and the existence of dependent claims that would be rendered superfluous by such a construction. The term "rotating mechanism" appears in the independent claims of both the '155 and '802 patents, as shown below:

- '155 patent, claim 1: "a ***rotating mechanism*** fixed between the first inner cover and the second inner cover;"

- '802 patent, claim 1: "a ***rotating mechanism*** fixed between the first inner cover and the second inner cover, the rotating mechanism having two bearings, a shaft sleeve, and two snap springs, the two bearings fixed to the first inner cover and the second inner cover, respectively, and the shaft sleeve fixed inside the two bearings and fixed to the inner cover via the two snap springs[.]"

As explained in the specification, "[t]he rotating mechanism 60 is fixed between the first inner cover 21 and the second inner cover 22. In the first embodiment, the rotating mechanism 60 includes two bearings 61, a shaft sleeve 62, and two snap springs 63. The two bearings 61 are fixed to the inner ends of the first inner cover 21 and the second inner cover 22, respectively. The shaft sleeve 62 is fixed inside the two bearings 61 and is fixed

23

to the inner cover 2 via the two snap springs 63. Thus, the left and right inner covers of the inner cover 2 can rotate under the cooperation of the rotating mechanism 60. Due to the arrangement of the rotating mechanism 60, the two parts of the vehicle body of the electric balance vehicle 100 can rotate freely and relatively." ('155 patent at 6:12-24 (App. 15)).

As Dr. Maslen points out, there are several reasons why § 112(f) should not apply. (*See* Maslen Decl. at 8-10 [D.I. 90]; *see also* Maslen Dep. at 26:19-29:8 (App. 187)). To begin, the claim term does not use "means for," so there is a presumption that § 112(f) does not apply. *Albritton v. Acclarent, Inc.*, No. 3:16-CV-03340-M, 2019 WL 1379984, at *6 (N.D. Tex. Jan. 16, 2019) ("The absence of the word 'means' in a claim creates a rebuttable presumption that Section 112(f) does not apply.") (Lynn, C.J.). A party rebuts a presumption only when it "demonstrates that the claim term fails to 'recite[] sufficiently definite structure' or else recites a 'function without reciting sufficient structure for performing that function.'" *Id.* Defendants have not done so.

Second, a claim term is generally not a means-plus-function limitation where the surrounding claim language or dependent claims add limitations that either describe particular structural features or flesh out whether the term has a particular structural meaning. *See TEK Glob.*, 920 F.3d at 786. Here, claim 1 of the '155 patent recites "a rotating mechanism fixed between the first inner cover and the second inner cover;" and dependent claim 5 adds "[t]he electric balance vehicle according to claim 1, wherein the rotating mechanism comprises two bearings, a shaft sleeve, and two snap springs . . ." Adoption of Defendants' proposed claim construction would improperly render claim 5

24

meaningless. Additional examples include claims 9 and 14-18 of the related '036 patent, which recite other configurations for the rotating mechanism. (App. 48). Such "[d]ifferences among claims can also be a useful guide in understanding the meaning of particular claim terms." *Phillips*, 415 F.3d at 1314; *see Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 910 (Fed. Cir. 2004) ("As this court has frequently stated, the presence of a dependent claim that adds a particular limitation raises a presumption that the limitation in question is not found in the independent claim.").

Third, the prior art '278 Chen Patent cited on the face of the asserted patents confirms that rotating arrangements were known in the art. (*See* '278 Chen Patent at 3:36-62 (App. 56)). And both sides' experts agree that rotating mechanisms are mechanical elements known in the art. (*See* Maslen Dec. at 10-13 [D.I. 90]; 2019-08-23 Singhose Dep. at 33:23-34:14 (App. 225-226)). Finally, other courts have rejected application of § 112(f) to similar terms, including "locking mechanism," "movement mechanism," and ***"rotation mechanism***." *See, e.g., Apex Inc. v. Raritan Computer, Inc.*, 325 F.3d 1364, 1372 (Fed. Cir. 2003) (quoting *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1369 (Fed. Cir. 2002)); *see Integrity Worldwide, LLC v. Rapid-EPS LTD.*, No. 3:17-CV-0055-K, 2018 WL 3609430, at *5 (N.D. Tex. May 29, 2018) ("locking mechanism" not means-plus-function); *Nanology Alpha LLC v. WITec Wissenschaftliche Instrumente und Technologie GmbH*, No. 6:16-CV-00445-RWS, 2017 WL 5905272, at *10 (E.D. Tex. Nov. 30, 2017) ("movement mechanism" not means-plus-function); *Accuhale, LLC v. AstraZeneca, LP*, No. 6:11-CV-707, 2013 WL 4045904, at *8 (E.D. Tex. Aug. 7, 2013) ("rotation mechanism" not means-plus-function).

For at least these reasons, the Court should reject Defendants' proposed construction and adopt a plain and ordinary meaning construction for "rotating mechanism."

4. "bearing"

| Plaintiffs' Proposal | Defendants' Proposal |
|---|---|
| plain and ordinary meaning<br><br>alternatively, a machine part in which another part turns or slides | First: a machine element that constrains relative motion to only the desired motion and reduces friction between a rotating part and its housing<br><br>Second: a machine element that constrains relative motion to rotation and reduces friction between a rotating part and its housing |

The dispute over the term "bearing" is whether to construe the term bearing narrowly to include only rotational bearings, or whether the term should be given the full expanse of its plain and ordinary meaning, which would include all types of bearings (*e.g.*, rotational, axial, sliding, thrust, etc.). The term "bearing" appears in claim 5 of the '155 patent and in claim 1 of the '802 patent in the context of a "rotating mechanism having two **bearings**, a shaft sleeve, and two snap springs . . . ." (App. 17, 32).

Starting with the plain meaning of the claim language, the term "bearing" is a noun that refers to a well-known class of mechanical devices used to support moving parts. As shown in the learned treatises and dictionaries quoted below, there are various types of bearings—including simple bearings, ball bearings, and thrust bearings—all of which can be used to support moving parts of a mechanical device:

26

- <u>McGraw Hill Dictionary of Scientific and Technical Terms, p. 218</u> ("bearing . . . [MechEng] A machine part that supports another part which rotates, slides, or oscillates") (App. 147);

- <u>McGraw Hill Dictionary of Scientific and Technical Terms, p. 2147</u> ("thrust bearing [MechEng] A bearing which sustains axial loads and prevents axial movement of a loaded shaft") (App.148);

- <u>Bearing (mechanical) - Simple English | Wikipedia</u> ("A bearing is a device to permit fixed direction motion between two parts, typically rotation or linear movement.") (App. 150);

- <u>https://www.merriam-webster.com/dictionary/bearing</u> ("Bearing, noun 3b: a machine part in which another part (such as a journal or pin) turns or slides") (App. 153);

- <u>Machinery's Handbook 18th Ed. (1967), p. 525</u> ("Bearings that provide sliding contact between mating surfaces fall into three general classes: radial bearings that support rotating shafts or journals; thrust bearings that support axial loads on rotating members; and guide or slipper bearings that guide moving parts in a straight line.") (App. 169);

- <u>Mark's Standard Handbook for Mechanical Engineering, p. 8-120</u> ("Plain bearings, according to their function, may be Journal bearings, cylindrical in shape, carrying a rotating shaft. Thrust bearings, the function of which is to prevent lengthwise motion of a rotating shaft. Guide bearings, to guide a machine element in its lengthwise motion, usually without rotation of the element.") (App. 173).

The use of the term "bearing" in the claims and in the specification is entirely consistent with the plain and ordinary meaning of the term. (*See* '155 patent at 6:12-29 (App. 15)). Defendants' proposed construction would unnecessarily restrict the term bearing in a way not required by the plain language of the claim or by anything in the specification. Accordingly, the Court should reject Defendants' proposed construction and apply a plain meaning construction for the term "bearing." Alternatively, to the

extent that the Court requires a definition for bearing, it should define the term bearing as "a machine part in which another part turns or slides."

### 5.    "limiting shaft"

| Plaintiffs' Proposal | Defendants' Proposal |
| --- | --- |
| plain and ordinary meaning | indefinite |

The dispute over the term "limiting shaft" is, firstly, whether it is governed by §112(f), and, if so, whether it is indefinite for lack of written description support. The answer to both questions is no. The term "limiting shaft" appears in claim 13 of the '155 patent and claim 11 of the '802 patent, as shown below:

- "The electric balance vehicle according to claim 1, further comprising a *limiting shaft* disposed between the first inner cover and the second inner cover, wherein the length of the limiting shaft in the second inner cover is larger than the length of the limiting shaft in the first inner cover."

- "11. The electric balance vehicle according to claim 1, further comprising a *limiting shaft* disposed between the first inner cover and the second inner cover, wherein the length of the limiting shaft in the second inner cover is larger than the length of the limiting shaft in the first inner cover."

The specification includes an example embodiment with a limiting shaft 7 to prevent "overlarge relative rotation" of the inner covers.

In order to limit an overlarge relative rotation angle between the first inner cover 21 and the second inner cover 22, the electric balance vehicle 100 further includes a limiting shaft 7, and the length of the limiting shaft 7 in the second inner cover 22 is larger than the length of the limiting shaft 7 in the first inner cover 21. In the embodiment, the limiting shaft 7 is located between the inward ends of the first inner cover 21 and the second inner cover 22.

('155 patent at 6:47-55 (App. 15)). The limiting shaft 7 is highlighted in Figs. 1-2 below:





As depicted in the cross-section view of Fig. 1, the limiting shaft 7 is located between the inner ends of the inner covers and is situated with more of the length of the limiting shaft in the second inner cover than in the first inner cover. Because the claim language does not include the words "means for," there is a presumption that the term "limiting shaft" is not a § 112(f) limitation. *Albritton*, 2019 WL 1379984, at *6. Additionally, the claim language, the figures, and the descriptions in the specification all make clear that that limiting shaft is a structural part with a particular type of shape. The merely inclusion of the functional language "limiting" does not render the term a means-plus-function limitation or indefinite. *See, e.g., Zeroclick*, 891 F.3d at 1008. Indeed, Defendants' own extrinsic evidence includes a definition showing that the plain and ordinary meaning of the term "shaft" is "a long thing object or part," (App. 268) (Merriam-Webster, "shaft"), which is precisely what is shown and described in the specification of the patent. Thus, the term "limiting shaft" is not governed by § 112(f) or indefinite.

29

### 6.     "an inner cover fixed between the top cover and bottom cover"

| Plaintiffs' Proposal | Defendants' Proposal |
|---|---|
| plain and ordinary meaning, incorporating the definitions for the terms "inner cover" and "fixed" | an inner cover (as defined) fixed (as defined) inside the top cover and bottom covers so that it is not exposed |

The phrase appears in the independent claims of the '155 and '802 patents. The dispute is whether to change the word "between" to "inside," and add "so that it is not exposed" to the end of the claim language. There is nothing in the patent to compel such changes, which are merely proposed for strategic litigation purposes, and not for any legitimate claim construction purpose. Accordingly, the Court should reject Defendants' proposed construction and adopt a plain and ordinary meaning construction for this phrase.

### CONCLUSION

Plaintiffs ask that the Court reject Defendants' proposed constructions and adopt constructions for the disputed claim terms that are consistent with the plain and ordinary meaning of the claim language in light of the specification.

Dated:  November 11, 2019

Respectfully submitted,

*/s/ S. Wallace Dunwoody*

Michael C. Wilson
mwilson@munckwilson.com
Texas Bar No. 21704590
S. Wallace Dunwoody
wdunwoody@munckwilson.com
Texas Bar No. 24040838
Kelly P. Chen
kchen@munckwilson.com
Texas Bar No. 24062664
**MUNCK WILSON MANDALA, LLP**
12770 Coit Road, Suite 600
Dallas, Texas 75251
Telephone: (972) 628-3600
Telecopier: (972) 628-3616

**ATTORNEYS FOR PLAINTIFFS/
COUNTERDEFENDANTS**

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a true and correct copy of the foregoing document was served on the below counsel of record via the Court's electronic filing system on this 11th day of November, 2019.

William Chu
William Knisley
The Law Offices of William Chu
4455 LBJ Freeway, Suite 1008
Dallas, Texas 72544
wmchulaw@aol.com
knisley.wmchulaw@gmail.com

Tony Pezzano
Michael Dougherty
DLA Piper LLP (US)
1251 Avenue of the Americas
New York, NY 10020-1104
tony.pezzano@dlapiper.com
michael.dougherty@dlapiper.com

C. Michael Moore
Marina Stefanova
DLA Piper LLP (US)
1900 N. Pearl Street, Suite 2200
Dallas, TX 75201
mike.moore@dlapiper.com
marina.stefanova@dlapiper.com

/s/ S. Wallace Dunwoody
S. Wallace Dunwoody

813877